## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **Case No. 2:18-cr-94** |
| | : | |
| **Plaintiff,** | : | **Judge Michael H. Watson** |
| | : | |
| **vs.** | : | |
| | : | |
| **JOHN R. CACARO,** | : | |
| | : | |
| **Defendant.** | : | |

---

## DEFENDANT'S SENTENCING MEMORANDUM

---

Defendant John R. Cacaro, by and through undersigned counsel, hereby submits the following Sentencing Memorandum for the purposes of mitigation and in accordance with those relevant factors set forth by 18 U.S.C. § 3553 (a).

\* \* \*

Per the Court's order, this matter is set for a sentencing hearing at 10 a.m. on December 4, 2018 (Doc. 20.) The purpose of this Memorandum is to assist the Court in imposing a reasonable sentence by explicating the unique factual predicate which underlies Mr. Cacaro's admittedly unlawful conduct.

As will be set forth more fully below, the facts and circumstances attendant to this offense constitute an extraordinarily compelling basis for a downward departure and/or variance. Not only will Mr. Cacaro tender full restitution at the time of his sentencing, but he made significant (albeit partial) restitution before the investigation even began. He has voluntarily wound down the corporate entity associated with this conduct and has suffered devastating financial consequences as a result. Given these facts alone, a sentence of home incarceration and/or a period of supervised release would still recognize the seriousness of the offense and

provide adequate general deterrence to the small pool of potential defendants who might be tempted to engage in such conduct.

These facts, however, barely scratch the surface of the most persuasive rationale for departure/variance – namely, the immediate, catastrophic and unfair impact a sentence of incarceration would have on Mr. Cacaro's troubled immediate family. Mr. Cacaro's 35-year-old son suffers from severe developmental disabilities and requires round-the-clock care. Neither Mr. Cacaro's wife (who suffers from Grave's disease) nor the other adult son who resides with him (who is recovering from a heroin/opiate addiction) can meaningfully contribute to this care, either financially or in terms of tending to his day-to-day physical needs. Most days, these responsibilities fall to Mr. Cacaro and Mr. Cacaro alone.

In the final analysis, no societal or policy interest will be served by incarcerating Mr. Cacaro. He admitted to his conduct from the start and has done what he can to remedy it. Mr. Cacaro respectfully requests that the Court craft an appropriate, non-custodial sentence which both recognizes the seriousness of the offense while recognizing the unique familial burdens he shoulders on a daily basis.

## NATURE AND CIRCUMSTANCES OF THE OFFENSE

On June 5, 2018, Mr. Cacaro pled guilty to one count of Wire Fraud (18 U.S.C. § 1343 and 2) and one count of Money Laundering (18 U.S.C. § 1957 and 2). Both are Class C felonies as set forth in the United States Code.

Mr. Cacaro has always acknowledged the wrongfulness of his conduct, and the plea negotiations largely consisted of ascertaining a fair and accurate restitution number. The final

2

agreed amount is $425,246.58.[1] Mr. Cacaro has liquidated his personal and business real estate, and will be in a position to tender full restitution in that amount at his sentencing hearing.

The precise nature of Mr. Cacaro's unlawful conduct is straightforward: He caused his now-defunct company (Employers Choice Plus LLC) to underpay premiums to the Ohio Bureau of Worker's Compensation ("BWC") in a fruitless effort to cover up the serial mismanagement of its clients' funds.

Mr. Cacaro's company was recognized as a Professional Employer Organization ("PEO") under Ohio law. PEOs serve as third-party administrators for small-to-mid-size companies which cannot afford their own human resources or payroll functions. In many cases, PEOs also interface with state worker's compensation and unemployment agencies on behalf of their clients. Over a two-year period, Mr. Cacaro directed company officials to under-report (and thus underpay) the BWC premiums due on behalf of five of his clients. While these five companies were assuredly (and regrettably) inconvenienced by the investigation, the sole victim in this case for purposes of restitution is the BWC.

The Money Laundering count stems not from any direct or unusual deposit of ill-gotten funds to Mr. Cacaro's accounts, but from his continual salary draws and pre-planned purchases during this period of underreporting. This particular breed of wire fraud did not involve separate unlawful conduct, but was a natural and necessary consequence of Mr. Cacaro "keeping up appearances."

While the statutory violations set forth in the Plea Agreement were indeed straightforward, the facts and circumstances attendant to them were anything but. Indeed, they

---

[1] While this may seem unusual in an adversarial proceeding such as this one, both undersigned counsel and Mr. Cacaro would like to extend their sincere appreciation to Assistant United States Attorney Jessica H. Kim and her entire team for the fair and even compassionate manner in which they conducted this investigation. Likewise, U.S. Probation Officer David J. Ackermann afforded Mr. Cacaro great respect and dignity throughout the Presentence Investigation process, and his professionalism meant a great deal to all concerned.

3

are complex, sad and portray Mr. Cacaro in a very different light than does the bare plea language. This is ultimately a tale of desperation in which Mr. Cacaro robs Peter to pay Paul, not the work of a criminal mastermind hatching an unlawful scheme designed to gratuitously line his pockets. The following facts and circumstances are offered by way of mitigation, but not excuse, and in accordance with the considerations embodied in 18 U.S.C. § 3553 (a)(1):

- ***Mr. Cacaro was under almost unimaginable personal and financial duress at the time he ordered the underpayments.***

In the spring of 2012, Mr. Cacaro's life was turned upside down by circumstances wholly beyond his control. His wife Patricia (to whom he has been married for 39 years) had what appeared to be a series of heart events which left her bed-ridden. In June of that year, she was diagnosed with Grave's Disease, a potentially fatal autoimmune condition which causes heart-attack-like symptoms in those it afflicts. She experienced several additional "thyroid storms" due to the condition, causing severe chest pain, skin problems, rapid weight loss and extreme fatigue. The disease is genetic in origin and there is no known cure.

During this period, Mr. Cacaro's college-age son Corey went missing. In late 2012, the family discovered that he suffered from an all-consuming heroin addiction. What followed is familiar to any family so situated – a revolving door of failed attempts at sobriety, in-patient treatment facilities, petty theft, near-homelessness and endless recrimination. Corey, now 23 years-old, is now nine months sober and resides full-time with his parents in their new home in Mason, Ohio.

These events notwithstanding, life was already stressful for Mr. Cacaro. His middle son, John Ross Cacaro, has never left home. At age 35, he is simply unable to take care of himself. His severe developmental disabilities (both mental and physical) have rendered him unable to

4

speak or perform most basic functions relating to self-care, including feeding himself.[2] The Cacaros long ago adapted their lives to providing for his every need, but the burden now falls almost exclusively on Mr. Cacaro.[3] As the Presentence Report correctly indicates, Mr. Cacaro and John Ross enjoy an incredibly close bond, one borne by Mr. Cacaro's practice of taking his son to work with him every day so he can better tend to his constant needs.

It was in this context that Mr. Cacaro first learned that his company had underpaid approximately $800,000 in worker's compensation "carve out" premiums for its clients. Mr. Cacaro precisely learned of this shortfall in January, 2013. Based upon Mr. Cacaro's investigation, the problem arose due to his new Chief Financial Officer's misunderstanding and misapplication of the relevant formula for calculating the amount of client premiums to be withheld for subsequent distribution to the BWC (embezzlement was suspected but never proven). After the BWC's investigation began, Mr. Cacaro was shocked to discover that two significant premium payments had been missed altogether. Regardless, Employers Choice Plus had taken funds from his clients for worker's compensation premiums, and had instead spent those funds on a swelling payroll and other company expenses. Based upon the preliminary numbers, Mr. Cacaro mistakenly thought his company was having a banner year.

None of these facts and circumstances excuse the conduct to which Mr. Cacaro has admitted. The context they provide, however, is important and revealing. Mr. Cacaro was faced with a Hobson's choice – self-report the shortfall to the BWC (and see his company immediately stripped of its PEO designation and forced out of business) or under-report his respective clients'

---

[2] John Ross Cacaro suffers from a battery of ailments in addition to his developmental disabilities. He has been diagnosed with autism, type-2 diabetes, high blood pressure and a seizure disorder. Due to his disabilities, Mr. Cacaro monitors his sugar levels and is exclusively responsible for administering the various medications he must take through each day. He also has to prepare all of his food and ensure that he is timely fed.

[3] John Ross Cacaro is unable to tend to his personal hygiene due to his lack of fine motor skills. Consequently, Mr. Cacaro bathes and shaves him each morning, and even has to brush his teeth.

9068987.1

premium liability and hope to somehow make up the difference later. Mr. Cacaro chose the latter, unlawful course and thus stands before this Court awaiting his sentencing.

- ● *Mr. Cacaro tried to rectify the underpayment before the investigation began.*

Undersigned counsel has practiced law for 20 years without encountering the undisputed fact present in the case at bar: Mr. Cacaro undertook efforts to pay back the under-reported premiums before this investigation even began. More than any other fact, this attempted (and partially successful) repayment of the premiums speaks to the bumbling and one-time nature of Mr. Cacaro's conduct.

It is uncontested that 2013 and 2014, Mr. Cacaro filed "amended payroll reports" in which he attempted to make up for some of the previously under-reported premiums. While these reports were also inaccurate, they were, amazingly, inaccurate to the benefit of the Bureau. During this same period, Mr. Cacaro took other actions to save the company, cutting payroll by 40 percent, selling its real estate and slashing salaries (including his own). Mr. Cacaro will tell the Court that he was anxious with guilt over the underpayments, and he hoped that, in some way, his efforts to address them after the fact would reflect favorably upon him if and when his actions were ever discovered.

The restitution amount before the Court incorporates a significant offset for this partial repayment. In fact, this calculation took up the bulk of the time in the plea negotiations associated with this matter. This is hardly the work of a hardened criminal mind carrying out a long-term criminal enterprise. Nothing speaks more loudly to Mr. Cacaro's character than the guilt and shame which compelled him to make these partial repayments.

9068987.1

- ***Mr. Cacaro immediately accepted responsibility.***

This investigation, like many others, began with the service of a *subpoena duces tecum* by federal authorities. Mr. Cacaro accepted service personally, and made incriminating statements out of the gate. In fact, he essentially admitted the conduct at the time of service.

Mr. Cacaro will tell the Court during his sentencing hearing that he was actually relieved to learn of the investigation, and that he welcomed the chance to try and render some recompense for his misdeeds. While he did not immediately apprehend that the consequences would be criminal in nature, he did immediately accept responsibility, fully cooperate with the investigation and provided timely notice to the United States of his intention to enter a guilty plea. This full acceptance of responsibility is reflected in the Presentence Investigation Report, which correctly accords Mr. Cacaro the full three points' credit available under U.S.S.G §§ 3E.1(a) and (b).

- ***The conduct underlying the Money Laundering conviction is not the worst form of the offense.***

In May, 2013, Mr. Cacaro purchased a 2014 Allegro motor home. The down payment involved $11,000 in company proceeds. By this point, the underpayments had already occurred and the company's legitimate funds were commingled with funds which should have been paid on behalf of various Employers Choice Plus customers.

While there can be no excusing this expenditure, it is worth noting that Mr. Cacaro's intent was far from nefarious. The motor home was intended for use on family trips for his ailing wife and sons. Indeed, they undertook several cross-country journeys in the motor home – trips which greatly contributed to the respective healing processes of all involved. Again, these facts are proffered to provide context and color, not absolution. Mr. Cacaro indisputably and admittedly withdrew and spent tainted funds. He did not, however, secret those funds away to an

7

offshore account. Both the amount and the nature of the expenditure were modest and in keeping with Mr. Cacaro's unfortunate story – that of a beleaguered husband and father who was, at the time of this offense, being pushed daily to his emotional limits.

## HISTORY AND CHARACTERISTICS OF JOHN R. CACARO

Pursuant to U.S.C. § 3552(a)(1), this Court must consider the personal history and characteristics of the Defendant. While much of this information is inextricably intertwined with the nature and circumstances of the offense as set forth above, there are still compelling aspects of John Cacaro The Person which this Court should take into account prior to sentencing.

Perhaps most importantly, Mr. Cacaro has lived his 59 years as an otherwise-law-abiding citizen. He has no criminal record of any kind, save for minor traffic offenses. He has been long active in his church (St. Joseph's Catholic Church in West Chester, Ohio) and has raised four adult children, two of whom still live with him due to their difficult personal circumstances.

He graduated from Madeira High School in Madeira, Ohio (a small community northeast of Cincinnati proper) and studied business at Xavier University for several years before leaving to take his first job in the employment industry. As noted *supra*, he has been married to his wife Patricia since June 9, 1979. He is also partially responsible for the care of his elderly mother, Rita Cacaro, who lives in the Cincinnati area.

As noted *supra*, Mr. Cacaro has long been burdened with singularly unique and difficult familial responsibilities. Not only does he care for his ailing wife, but his son Corey continues to reside with him. Mr. Cacaro is very active in his recovery from heroin/opioid addiction and the treatment of his underlying mental health issues, which include bipolar disorder. His son John Ross will require round-the-clock care due to his aforementioned severe developmental disabilities for the rest of his life. Were Mr. Cacaro to be incarcerated, the impact on John Ross would be particularly devastating.

9068987.1

The Cacaros now live in significantly diminished circumstances, their formerly affluent lifestyle a permanent casualty of Mr. Cacaro's conduct. Indeed, these circumstances have even changed from the time of the drafting of the Presentence Investigation Report. They no longer reside in the five-bedroom West Chester residence described in that report, and instead live in a three-bedroom rented ranch home in Mason, Ohio. They were forced to sell their home, as well as their commercial property, due to the closure of Employers Choice Plus and the need to raise funds for the restitution and fines associated with the instant Plea and Information.

Despite these allegations, Mr. Cacaro remains beloved by his employees. As Exhibits A through D indicate, he repeatedly went above and beyond for his employees who were mobilized and/or deployed as reservists, and routinely provided benefits in excess of what was required by applicable law.

It is also relevant that Mr. Cacaro was a successful businessman who created many high-paying jobs through his various entrepreneurial activities. With the notable exception of the charged conduct, Mr. Cacaro was regarded as a pillar of the small West Chester business community, the kind of man who would be asked to mentor other fledgling upstart businesses. Exhibits E through G provide a representative example of his impact on his colleagues. His decades of providing employment, growth and vitality to this growing part of Butler County should not be overlooked.

Lastly, and pertinently, Mr. Cacaro suffers from a battery of health conditions which, while not life-threatening, would make a period of incarceration burdensome for all involved. Paragraph 56 lays out an exhaustive list of Mr. Cacaro's medical conditions and prescribed medications, but it should be noted for the purposes of this Memorandum that he is diabetic and requires insulin shots thrice daily. He also cannot sleep without a continuous positive airway

9

pressure (CPAP) machine. These are conditions for which he will be treated on a daily basis for the rest of his life.

In sum, Mr. Cacaro is a good man who did a bad thing. During the past five years, he has faced every kind of personal crisis imaginable. The incredible stress associated with these events – disease, addiction, round-the-clock care for a disabled child – must be taken into account when assessing an appropriate sanction. At the end of the day, his unlawful conduct primarily consisted of an effort to cover up missteps by his employees -- and never involved an affirmative scheme to create and retain ill-gotten wealth.

## **NEED FOR THE SENTENCE IMPOSED**

This Court is well-aware of that 18 U.S.C. § 3553 (a) (2)(A)—(D) requires the consideration of various factors which assess the objective need for the sentence rendered. These concerns range from remediating the specific conduct to the societal import (and policy prerogative) of general deterrence.

Mr. Cacaro respectfully submits that, when applying these factors, the Court should review *United States v. Musgrave*, 647 Fed. Appx. 529 (6th Cir. 2016). In *Musgrave*, the Sixth Circuit ultimately affirmed a sentence of one day of incarceration (for processing), 24 months of home incarceration, five years of supervised releases and a substantial fine for a similarly-situated "white collar" defendant. While *Musgrave* involved a much more elaborate scheme (and $1.7 million in losses), the principles underlying the decision merit strong consideration given the multiple factual analogues between the two cases.

For instance, 18 U.S.C. § 3353 (a)(2)(A) requires the sentencing court to hand down sanctions which recognize the "seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." In *Musgrave*, the Court allowed that the inherently "serious" nature of any fraud may be tempered by the factual circumstances attendant to the

10

offense. As in *United States v. Howe*, 543 F.3d 128, 133 (3d Cir. 2008) (cited in *Musgrave*), Mr. Cacaro's unlawful conduct stemmed from a single impulse but was carried out over many months. Mr. Cacaro's conduct harmonizes with that which was at issue in *Musgrave* in another important respect – his crime was less about "lining his pockets" than about keeping a struggling business afloat. While we in no way suggest that these circumstances render Mr. Cacaro's conduct noble, they certainly go to the mitigating circumstances which inform it. Mr. Cacaro's conduct was admittedly "serious," and gravely so. In fairness, however, Mr. Cacaro mitigated that seriousness at every turn with his full cooperation and *ex post facto* efforts to remedy his wrongdoing.

18 U.S.C. § 3353 (a)(2)(B) addresses the need for a sentence to "afford adequate deterrence to criminal conduct." Indeed, it was the government's concern with so-called "general deterrence" which served as the basis for its *Musgrave* appeals. In this matter, the purposes of general deterrence have already been well-served. As is its wont, the United States has publicized Mr. Carcaro's guilty plea far and wide. New stories derived from a Department of Justice press release ran in all major Ohio media markets; even the local newspaper in Naples, Florida (where the Cacaros own a vacation home) published several column inches about Mr. Cacaro's misconduct. Regardless of the Court's ultimate sentence, Mr. Cacaro has already been publicly castigated as a "poster child" for workers compensation premium misuse and abuse. Moreover, a sentence involving home incarceration, supervised release, restitution or a fine would surely serve as a strong warning for anyone contemplating similar conduct. As the *Musgrave* court noted, such sanctions impose a substantial limitation on a person's liberty, especially for a first-time, older defendant like Mr. Cacaro.

It must also be noted that the pool of potential defendants to be deterred is a small one. Mr. Cacaro's wrongful conduct was highly specific and could only be carried out by an

11

individual who leads a PEO. That is, very few members of the general public would ever be in a position to collect and under-report large amounts of workers compensation premiums. Mr. Cacaro respectfully submits that his case has already served a deterrent purpose, and that his experience now stands as the premier cautionary tale within his former industry.

Given the facts of this case, the remaining factors have limited applicability. 18 U.S.C. § 3353 (a)(2)(C) requires the Court to consider whether its sentence will "protect the public from further crimes of the defendant." No party to this cause can seriously contend that Mr. Cacaro, awash in contrition and cooperation, would ever engage in similar conduct in the future. More importantly, his doing so would be a practical impossibility. He has wound down his company and has no vehicle through which to perpetrate similar misconduct. 18 U.S.C. § 3353 (a)(2)(D) demands that the Court provide the defendants "with needed education or vocational training, medical care or other correctional treatment in the most effective manner." At age 59, Mr. Cacaro is not in need of additional educational or vocational training. He is, however, in need of ongoing medical care, and the ability of the Bureau of Prisons to manage that care is questionable. At a minimum, his incarceration would needlessly burden an already-stressed system.

At the end of the day, the 18 U.S.C. § 3353 (a)(2) factors, as applied to these facts, do not militate toward a custodial sentence. The Court has other tools at its disposal which are more than adequate to punish the admitted conduct and deter those who might be considering such misdeeds.

### GUIDELINES AND 18 U.S.C.§ 3553 (a)

As the Court is well-aware, it must consider whether the facts – taken as a whole and as applied to the 18 U.S.C.§ 3553 (a) factors – warrant a sentence outside the advisory guideline

9068987.1

system. *Gall v. United States*, 552 U.S. 38, 51 (2007). In this post-*Booker* world, the Court possesses more discretion than ever before to grant a variance from the Guidelines.

The U.S. Probation Department has correctly calculated that, based upon the offense and attendant facts, Mr. Cacaro's conduct merits a Total Offense Score of 17 and a Criminal History Category of One. The recommended sentence is 18 months, which indeed already constitutes a variance from the Guidelines.

That said, the atypical facts of this case yield a strong argument for a further variance and a non-custodial sentence. 18 U.S.C. § 3553(a)(4) requires that this Court consider the Guidelines range as a starting point. It must be noted, however, that the United States has not requested an agreed sentence in this case and that the U.S. Probation Department, in recognition of both Mr. Cacaro's early and complete acceptance or responsibility and unusual family obligations, has already indicated that a variance from the Guidelines range is appropriate. Given this context, Mr. Cacaro respectfully submits that the real question before the Court is how great the variance, and whether non-custodial options should indeed be on the table.

It is also noteworthy that the remaining relevant 18 U.S.C. § 3553(a) factors weigh in favor of further variance and non-custodial sanctions. The 18 U.S.C. § 3553(a)(6) consistency requirement is often cited by the United States as statutory basis for custodial sentencing in "white collar" cases, the argument being that more lenient sentences set the bar too low. That said, the *Musgrave* holding again provides instructive and contrary guidance. The district court in that case noted that nearly one-third of "white collar" defendants – both nationally and in the Southern District of Ohio – receive some form of home incarceration. *Musgrave* at 538. The very nature of "white collar" offenses – with their varying amounts of loss and shifting levels of culpability – render consistent sentencing difficult-if-not-impossible. In this case, the facts are so

13

specific to both the defendant and the discrete industry involved that almost any sanction would arguably be consistent.

Similarly, 18 U.S.C. § 3553(a)(7) directs courts to consider "the need to provide restitution to any victims of the offense" when pondering an adequate sentence. While U.S.S.G. § 5H1.10 bars the consideration of "socioeconomic status" in sentencing, it does not moot the plain requirements of 18 U.S.C. § 3553(a)(7). In this case, Mr. Cacaro not only paid a portion of the restitution pre-investigation, he has moved heaven and earth to come up with the agreed-upon balance at the time of his sentencing. His good faith efforts in this regard should be accorded some weight in deciding whether to vary further from the Guidelines.

## KINDS OF SENTENCES AVAILABLE

Tthe Court is likewise obligated to at least consider all of the possible sentencing options at its disposal. Under the Guidelines, incarceration with the Bureau of Prisons is indeed an option. Straight probation, absent a downward departure/variance, would not be at the Court's disposal absent a downward departure.

An order of restitution is certainly *de rigueur* in cases such as this one, but full payment will be made at sentencing, rendering such an order a formality. Fines may range from $10,000 to $250,000. Likewise, home incarceration, followed by a period of supervised release, remains an option for the Court.

Mr. Cacaro respectfully requests that the Court limit its ultimate sentence to some combination of the non-custodial options set forth above. While his ability to pay a large fine will be somewhat limited, he does intend to continue working if he is not incarcerated. Home incarceration would indeed pose a burden, but it is a burden he is more than willing to bear should the Court so order. A custodial sentence, as set forth exhaustively above, would be an

9068987.1

absolutely devastating event for both Mr. Cacaro and his family. More importantly, the 18 U.S.C. § 3553(a) factors can be readily satisfied without a custodial sentence.[4]

## CONCLUSION

For the reasons state above, Mr. Cacaro respectfully requests that the Court grant a downward variance and enter an appropriate non-custodial sentence. Such a sentence would comport with the policy considerations underlying 18 U.S.C. § 3553(a), adequately punish this conduct and deter any others so inclined.

Respectfully submitted,

/s/ Steven P. Goodin
**Steven P. Goodin** (0071713)
GRAYDON HEAD & RITCHEY LLP
312 Walnut Street, Suite 1800
Cincinnati, OH 45202
Phone: (513) 629-2845
sgoodin@graydon.law

## CERTIFICATE OF SERVICE

I hereby certify that on November 20, 2018, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

/s/ Steven P. Goodin

9068987.1

---

[4] Should the Court order a term of incarceration, Mr Cacaro respectfully requests the privilege of self-turn and designation to the camp facility nearest his home with appropriate medical facilities.

15

9068987.1





**EXHIBIT**

A

UNDER THE SPONSORSHIP OF

REPRESENTATIVES MARGARET K. CONDITT
TIMOTHY DERICKSON - COURTNEY COMBS

On behalf of the members of the House of Representatives of the 129th General Assembly of Ohio, we are pleased to congratulate

EMPLOYERS CHOICE PLUS, INC.

on launching the Enhanced Community Partnership Program.

Employers Choice Plus, Inc., is deserving of high praise, for since its establishment, it has attained a remarkable record of service to the area. The company launched its Enhanced Community Partnership Program to support others through a variety of outreach efforts, including sending care packages to U.S. military personnel stationed overseas, and its inception is a justifiable source of pride and an outstanding reflection not only on the organization itself but also on its astute management, on its hard-working employees, and on the community.

Employers Choice Plus, Inc., has enhanced the quality of life within the surrounding area, and its generous contributions have earned it the gratitude and respect of many. We are certain that as this worthy agency maintains its dedication to service, it will continue in the tradition of excellence that has become its hallmark.

Thus, with sincere pleasure, we commend Employers Choice Plus, Inc., on its new program and extend best wishes for ongoing success.

Representative Margaret K. Conditt
House District 55

**WILLIAM G. BATCHELDER**
SPEAKER
OHIO HOUSE OF REPRESENTATIVES

Representative Timothy Derickson
House District 53

Representative Courtney Combs
House District 54

EXHIBIT

B

ALL-STATE LEGAL®



# Office of the Secretary of Defense
## EMPLOYER SUPPORT OF THE GUARD AND RESERVE

RECOGNIZES

### John Cacaro
### Employers Choice Plus

AS A

### PATRIOTIC EMPLOYER

FOR CONTRIBUTING TO NATIONAL SECURITY AND PROTECTING
LIBERTY AND FREEDOM BY SUPPORTING EMPLOYEE PARTICIPATION
IN AMERICA'S NATIONAL GUARD AND RESERVE FORCE



EXECUTIVE DIRECTOR
EMPLOYER SUPPORT OF THE GUARD AND RESERVE

NATIONAL CHAIR
EMPLOYER SUPPORT OF THE GUARD AND RESERVE



EXHIBIT

ALL-STATE LEGAL

C



# EMPLOYER SUPPORT of the GUARD and RESERVE

### PRESENTS THIS

# ABOVE AND BEYOND AWARD

## TO

# Employers Choice Plus

**PRESENTED ON BEHALF OF THE MEN AND WOMEN OF THE NATIONAL GUARD AND RESERVE FORCES, FOR OUTSTANDING SERVICE AND CONTINUING SUPPORT TO THE NATIONAL DEFENSE**



NATIONAL CHAIR
EMPLOYER SUPPORT OF THE GUARD AND RESERVE

EXECUTIVE DIRECTOR
EMPLOYER SUPPORT OF THE GUARD AND RESERVE





ESGR AC109 01/11

EXHIBIT

D



UNDER THE SPONSORSHIP OF

REPRESENTATIVES MARGARET K. CONDITT
TIMOTHY DERICKSON - COURTNEY COMBS

On behalf of the members of the House of Representatives of the 129th General Assembly of Ohio, we are pleased to extend special recognition to

JOHN CACARO

on receiving the Patriot Award from the U.S. Department of Defense and the Employer Support of the Guard and Reserve, May 31, 2012.

You are a remarkable individual, for you have combined civic concern and dedication with the utmost professionalism to become a dynamic leader in the community. The owner of Employers Choice Plus, you have admirably supported your employee, Bryan J. Moore, who serves in the Ohio Army National Guard, and through your unfaltering devotion to service and achievement, you have distinguished yourself as a conscientious and hard-working Ohioan.

Willingly giving of your time, energy, and abilities far beyond what was required or expected, you have striven to better the world around you, and you have earned the respect and esteem of colleagues, employees, and the community alike. We are certain that in the years to come, you will continue to display the same unwavering commitment to excellence for which you have become known, and you are truly deserving of high praise.

Thus, with sincere pleasure, we commend you on your recent accolade and salute you as one of Ohio's finest citizens.

*Margaret K. Conditt*
Representative Margaret K. Conditt
House District 55

*Timothy Derickson*
Representative Timothy Derickson
House District 53

*William G. Batchelder*
WILLIAM G. BATCHELDER
SPEAKER
OHIO HOUSE OF REPRESENTATIVES

*Courtney E. Combs*
Representative Courtney Combs
House District 54

**PREMIER CONSTRUCTION CO.**
Lumber • Trusses • Carpentry

Ph (513) 874-2611

Fax (513) 874-4893

9361 Seward Road
Fairfield, Ohio 45014



Dear Judge Watson,

I am writing to you on behalf of John Cacaro who will be appearing in your court. I have known John and his wife Trish since the early 1980's. He has been a kind family man and a neighbor that is well liked and trusted in the neighborhood. My family and his have shared many relaxing memorable times together..

John and his company ECP have had a major impact on my business, Premier Construction, by fighting bogus and mitigating workers comp claims. I am in the lumber supply business and managing the labor force is sometimes a challenge. His advice and professional help has helped my business survive. Honesty and integrity are traits that I have found in John for many years. I recommended him to my friends in the past and I will do the same in the future. Mistakes have been made and I am certain that John Cacaro will learn from them and continue to be an outstanding individual.

Sincerely,

Jan Gilkey

Office Equipment | Document Automation | Technology Solutions





November 20, 2018

Dear Judge Watson:

I have known John Cacaro for about 18 years. I first met John when our sons both attended the same pre-school. My son had befriended John's son Corey, which started a friendship between our families that has lasted ever since. Shortly after our introduction I began performing IT support for John's company, Employers Choice Plus, and have continued to work with him as an IT consultant to this day.

I have always believed (and still do) that John is an honest and sincere person. He has always been willing to go above and beyond to help those in need and has treated me, as well as those that work for him, fairly and with respect. As his IT consultant I became very familiar with his business and his employees. I have always respected John, not only for his success in business, but how he treated his employees and made them part of his family. There are many examples over the years where he has helped employees with through tough times with personal or financial issues. That is rare in today's world. I have always trusted and believed in John, as a friend, as a business associate, and as a good person.

I hope this letter conveys my belief in John's character and ethics.

Sincerely,

Jeffrey Loeb



**Brian S. Kammer**
6790 Hawthorn Knoll
Liberty Twp., OH 45011

November 20, 2018

The Honorable Judge Michael H. Watson
United States District Court
Joseph P. Kinneary U.S. Courthouse, Room 109
85 Marconi Boulevard
Columbus, OH 43215

RE: John R. Cacaro

Dear Judge Watson,

I have known John for over eight years. I am currently John's controller for Employers Choice Plus, WorkStar Health Services, Tylers Place Consulting, Car Couriers, and J Ross X. John and I have worked very closely together over the years, and continue to do so today.

John has been a boss, mentor, and friend during the time I have known him. As a boss, he has treated me with fairness, honesty, and respect. He has been a man that I have felt comfortable going to with any issue that I may have. I have the upmost respect for how he treats his employees, customers, and vendors. He has always been forthcoming with everyone around him. John has also been my biggest mentor in the business world. He has taught me so many valuable lessons, and I could not be more appreciative. He has encouraged me to learn, supported me when times were tough, and helped me understand the intricacies of his businesses. I have learned more from John than anyone else in my career. Lastly, and most of all, John has been a friend - not only to myself, but my family. He has helped me have a wonderful work/life balance, and ALWAYS asks about my wife and child. He has stressed to me that family is a very important part of his life. I have been fortunate enough to see John's patience, generosity, faith, and his deep care for everyone around him.

In closing, I want to express that I have the highest respect for John Cacaro. I truly believe that he is an honest, caring, and faithful person with undeniable character.

Sincerely,

Brian S. Kammer